Johnnie v. Spirit SPE, etc. But we'll let everyone clear the room. Hello, Mr. Voboli. Good morning. May it please the Court. Michael Vivoli on behalf of the appellant, Shahram Afshani. You know, I've struggled with what to refer to it as, but I'll just call it the seller-defendants, which are the two portfolio entities. The seller-defendants were the only ones, frankly, that cited specifically to the authority upon which the District Court based its decision, which is the five elements of the Forrest Oil and the IBM cases. They cited to no evidence, however, to support the application of the factors set forth. Most importantly, I would submit the first factor, which is that the terms of the contract were negotiated rather than boilerplate, and that during negotiations, the parties specifically discussed the issue which has become the topic of the subsequent dispute. Now, the District Court somehow reached the conclusion that, in fact, it was negotiated, or at least was negotiable, when, in fact, the record before the District Court made clear that it was expressly non-negotiable. Because, again, this was an auction. There was no opportunity to negotiate. In fact, the contract was required to be signed via DocuSign. So there's absolutely no way for that conclusion. There was, however, a, what do you call it, a cache of documents online that included, as I understand it, financial information for the entire company, ShopCo, and for the particular property, right? Some information, yes. There were operating-level store financials, but there were not, importantly, other financial information that only Spirit Realty had access to because it was a lender. And we provided that evidence before the Court. Well, I don't understand that because there was something in here about SEC filings would have plainly revealed that ShopCo's revenues were going down and its liabilities were going up. Well, that's, again, that gets into the publicly available information, but that's the SEC filing for Spirit Realty Capital, which is the parent, corporate parent of the two seller defendants. That isn't necessarily specific to those particular entities. I thought ShopCo's SEC filings. No, Your Honor. I believe it's actually Spirit Realty Capital's SEC filings that were— Is Spirit some overarching thing connected to ShopCo? Spirit Realty Capital I almost look at as the mothership. It's the REIT. It's a multi-billion dollar REIT. And the two portfolio entities were formed solely to hold title to these two pieces of property. Right. Well, I knew that. I knew about the entities, but I didn't— So the REIT owns the ShopCo properties. The REIT owned the entities, which in turn owned the real properties. Okay. And the information that was available in the online cache of documents was typical due diligence materials, but it has absolutely nothing to do with a bargain for negotiated contract, which there wasn't in this case. Well, I'm not disputing that at the moment as to the auction, but apparently the test of the Texas courts is a little more free-flowing, and that is that if the subject matter came up, it didn't have to be a matter of precise negotiation. Well, and again, when you say the subject matter, and that's one of the points I think that's important because one of the factors is the clarity or the specificity of the release language itself. The language they're pointing to, none of it talks about the tenant. None of it says tenant anywhere. In fact, the very first time any discussion came up about a tenant, and when they actually sought a release specific to the tenant, it was in a third aborted transaction where ultimately they canceled it. They raised this issue with a very conspicuous release. And they returned the non-refundable deposit. They did, and that was the only contract that was ever different, frankly. It was the same form of contract, and then they offered up a new independent release that was conspicuous for the very first time. And so the evidence before the district court was the first time they made it conspicuous that they were seeking a disclaimer concerning the financial wherewithal of the tenant was in fact in that release. And the evidence was my client refused to sign it. Now, all of this is to say this is not summary judgment as a matter of law. This is a factual dispute case. They had plenty of evidence, and they certainly brought it out before the district court to suggest that Mr. Afshani is a sophisticated party. Doesn't dispute that, but he did very specifically in his declaration explain why notwithstanding his background, the discussions they had, the very specific information they provided to him that made sense within the context, he had no, as he calls it, red flags, no observation of any red flags until the very end. Let me just look at this language here in the disclaimer, because it said, Purchaser acknowledges that, and I'm eluding a little bit, no seller party has made any representation or warranty as to the physical environmental condition, state of repair, income, expenses, operations of the property and surrounding property. To me, that can only mean one thing. That means the property encumbered by or with the benefit of a long-term SHOPCO lease. You can certainly argue that. I read it as more generic language that would be in any purchase and sale contract, whether there's an existing lease in place, whether there's a business that's owned by the seller that's in place, that happens sometimes, but I think the more important part of this is, again, this is another aspect of this, this is the contract that gets signed. Then they go into escrow. Then there are discussions that are had after the execution of this contract. This is talking about no, at the time this contract has been signed, no representations have been made. It's undisputed there were discussions after that point in time. Well, isn't there a merger clause or an entireties clause or something? I don't think, certainly, that takes this as a matter of law out. It just doesn't. What's the authority for that? I mean, it's Section 815 says this is the entire agreement between the parties, so what would be your Texas case that says we'd ignore that? The point is, the Texas case that says that presupposes that the five elements have been met, and here they haven't been. I understand your argument that you couldn't negotiate the waiver of reliance clauses as to the auctioned property because you pointed that document that was sort of on the website binding or whatever, but it doesn't apply to the second property. It does because the contract, again, is identical. The only difference between the two contracts is that they took out the auctioned part of it, but the contract, the form of the contract is, again, identical. But what is the basis for saying you couldn't negotiate away Suppose I just disagree with you and I think, in fact, this says you're waiving reliance on the representations from the seller. What is your argument that you couldn't have negotiated this or Mr. Afshani couldn't have negotiated it away, right? It wasn't known at the time the contract was signed, first and foremost. What wasn't known? I would also point out I do think this is directly responsive. The release itself carves out any liability of the seller for willful misconduct on the part of the seller. So you're saying that maybe you could have negotiated it. Maybe it is binding, but just doesn't apply because it has a carve out? First and foremost, I don't think this agreement is clear enough to exclude, as a matter of law, reliance upon the information that was later provided and, more importantly, the information that was concealed from Mr. Afshani because, again, this is both a willful concealment and a failure to disclose. Yeah, but there's no liability. I've just been through researching this recently. You don't have a liability for omission unless you had a duty to disclose. Well, the duty to disclose arises when you say something that makes it materially misleading or if you share part of it. And, again, when we were here the last time before a different panel, that was the discussion. If you say something, it has to be the full truth. Here there wasn't. Here there were half-truths and misleading statements that were made that are precisely the kind of conduct that gives rise to these claims. On the other hand, talking about surrounding circumstances, as I understand it, SHOPCO didn't file for bankruptcy until nearly a year after these purchases. I don't believe it was nearly a year. Well, maybe it was nine months. It was within a couple of months of the aborted third transaction. Is SHOPCO a publicly held company? No, I don't believe it is. Let me follow up on something you said earlier to see if there's any common ground here. On the five factors, I think I heard you concede that your client was a sophisticated party. He was a sophisticated party. Was this an arm's length transaction? Arm's length? I think you could argue that before a jury. You've got an admittedly sophisticated real estate purchaser, but on the other hand, you've got a multi-billion dollar REIT. Whether that's arm's length, whether there's any, you know, I think that there's room for argument on that. Okay, so maybe, but you're not recognizing it. I don't believe that I need to establish that in order to get this reversed. Was he represented during the contract negotiations? He actually was not. My recollection is he testified in his deposition. He wasn't. The district court concluded that he didn't, quote unquote, didn't dispute it. Where on the record, give me the record citation for that deposition testimony that establishes he was not represented. I actually looked for it, and it wasn't in what was part of the record on appeal. Well, aren't we limited to what's in the record? You are. Yeah, you are. But there's no evidence that he was represented. That's my point. They are the moving party. My client has no obligation to dispute anything until it's put in controversy by the moving party. They never put in any evidence to suggest that he was represented by counsel, and that's their burden as the moving party. Wait, it's their burden to show that there's an absence of, I mean, there's a five-factor test for avoiding these clauses. Right, but they have to. And those are your burden. Yeah. Well, I would submit as the moving party trying to enforce this, asserting these five elements, they have the affirmative obligation to factually support these. You keep saying elements. It's actually not elements, it's factors. Okay. And I'm not going to say that they're all required. Certainly they're not. But looking at it just facially, the first one is manifestly not applicable because it was expressly non-negotiable. The part about during discussions, and again, during negotiations that usually would precede the execution of the contract, that specific item got discussed. Again, most of the cases that they've cited are post-dispute cases where there's a settlement that gets entered into, and it's like, hey, we already talked about this. That's not this case. There was no discussion about any of this at the time these were signed. So number one doesn't apply at all. Number two, there's no evidence to support that he was represented by counsel in the transaction. Number three, again, parties dealt with each other at arm's length. You have to take into account, I think, the financial might and superior sophistication of the employees. The parties, we concede, number four, he's knowledgeable in business matters. We're not disputing that. Again, that the release language was clear. There's nothing in here that says tenant, and you've got an express carve-out for willful misconduct, intentional or willful misconduct, both of which exist in a fraud and non-concealment case. So from our perspective, this just can't be, as a matter of law, this case gets thrown out on this basis. If there's any other questions, I'm happy to address them. Let's see. I don't think so. Thank you very much. All right. You have time for rebuttal. I will. Thank you. Thank you. Okay. Mr. Phillips. Yes, Your Honor. May it please the Court, Rich Phillips here on behalf of Spirit Realty Capital, LLC, the entity referred to as the REIT here. I want to back up just a little bit. Two years ago, this Court sent the case, the fraud claims and misrepresentation claims, back to the trial court for discovery to see if discovery would support the allegations. What we discovered is not only do they not support the allegations, they revealed that Mr. Afshani's complaint was misleading to the Court. Mr. Afshani's complaint alleged that he had no experience with ShopCo as a company or a tenant at the time that he entered into these transactions. That turns out to be a straight lie. At the time he did this, he already owned property in the state of Utah where ShopCo was a tenant, which means he was getting the same tenant information that we were getting as a landlord about ShopCo. And that is simply . . . What do you mean the same information? He knew what their sales were. He was their landlord. He was getting information about them. Well, there's a . . . What sales? Site-specific or company-specific? He had information both. He had information about what was going on in his store, that he was the landlord. He also had company-wide information. And on top of that, he had company-wide information for ShopCo in the data room, as the Court has already acknowledged. The audited financial statements for ShopCo as a company were in the data room and showed significant declines in their sales over a three-year period, from a profit of about $9 million to a loss in multiple millions of dollars over three years. He also had in the data room for both properties . . . So why was he paying $11 million for this? Well, that's interesting. He was . . . Mr. Avshani, as we've talked about, is an experienced real estate investor who's closed over, he said, over $100 million in deals in the 10 years before this. What he does is buy what he calls distressed properties. Right. So he pays for . . . pays a discount on the idea that he will be able to turn the property around and make money. So did your company get a . . . sell at a discount? I don't know if there's any evidence in the record as to whether it was a discount versus a . . . I mean, I'm an ignoramus about all this, but $11 million sounds like a pretty good deal to me for the seller, but . . . I don't know if there's evidence about the market value. What I can say is it was sold on an auction site. And properties aren't sold on an auction site when they think that they can . . . you sell at an auction when you're just trying to get what you can get for it. That's the purpose of putting on an auction site. That's one of them. One of the deals. Well, and the other one, just to be clear, after he bought that property, he came back to us and said, I want to buy another one. Send me information about property similar to this one. And we did, and he picked one. So, again, and I think that again goes to the idea that somehow it wasn't negotiable. On the second one, at a minimum, he came back and said, I want to do this deal again. He didn't in that point say, but I don't want this disclaimer of reliance in there. And also, no one from the seller's side ever told him it was non-negotiable. He never asked. There's no evidence in the record that he asked if he could take out the disclaimer of reliance. Well, the auction thing settles that, it seems to me. I mean, I'm not . . . again, I'm an ignoramus about the specifics here, but I don't see a person coming to the auctioneer and saying, I'll buy this if I can negotiate. Agreed. But I think he also never . . . there's no evidence he attempted or asked about whether he could take it out. And then I'd go back to the idea that . . . Where is that required in any of the cases? I think, again, the question is, was there anything from the appellees, the defendants in this case, that told him the contracts were non-negotiable? That was from the auction site, not from us. But the other thing I'd point to is, as we've talked about a few times this morning, those are factors, not elements. And the other four factors, as Judge Starr found, weigh heavily in favor of enforcing this disclaimer of reliance. The Texas Supreme Court has made it clear, if you promise that you aren't relying on any statements that are not contained in the contract, you don't get to come back later and say, I was making that promise with my fingers behind my back. We are going . . . Texas enforces those. It's been very clear in the cases that are cited. One of the things I want to make clearly understand this morning is that all the arguments you heard from Mr. Beverly this morning, not a one of them was made in the District Court to Judge Starr. Not one. He did not talk about the five factors to Judge Starr. He raised three completely different arguments about whether these things, the disclaimer of reliance, could be enforced. And it's only in this Court that he complains about the five factors. Well, if the law is the law, he's entitled to argue the law. Agreed. But this Court has said that if you don't make a legal argument in the District Court to fight summary judgment, you can't raise it in the Court of Appeals. Judge Starr, he should have made these arguments to Judge Starr, and he did not. Not any of them. And that, I think, goes to this idea of burden. He's trying to avoid the disclaimer of reliance. He made three arguments about why it didn't apply, and Judge Starr rejected those. He doesn't make those arguments in this Court, the ones that Judge Starr rejected. Instead, he pivots to a completely new set of arguments. Was the Onalaska property purchased via auction? No. That's the one where he came back and said, I want to buy another one of these. The other thing I'd point out on the factors, we heard a little bit about whether it was a subject of discussion. I'd point the Court to the Transcor Astor case from the Texas Supreme Court that clarified what that factor means. Mr. Vivoli would have basically, there had to have been specific discussion about whether they were in financial trouble. Transcor Astor says that's not what we mean when we said that it has to be the subject of discussion. The question is, was the financials the subject of discussion? And there's no doubt that it was. All that information was in the data room and was available for him to look at. So all of those factors. The other factors, the counsel factor, it specifically says in the agreement that he had the opportunity to consult with counsel, and nowhere in the record, not in the record, and I don't think in his deposition did he say he was not represented by counsel. They've had many opportunities to specifically say he wasn't represented by counsel and they've pointedly never done so. If you read the brief in this Court, they're very careful to not say he was not represented by counsel. They've never made that argument. Whether it's an arm's length transaction, Judge Hendrick, I don't have any idea how you could say this wasn't. Two completely unrelated parties who were negotiating and dealing with each other at arm's length. There is nothing in this record to support the idea that this was anything other than arm's length. And is the language clear? Absolutely. It specifically promises I'm not relying on anything anybody told me if it's not in here. And we've put in our brief to compare that language to the language in the Texas Supreme Court cases of Schlumberger and Transcorastra and Forrest Oil where the Court has upheld these disclaimers, it's nearly identical. So all of those factors weigh heavily in favor of enforcing this disclaimer of reliance and holding him to the promise. He held himself out as an expert who said he can deal, he does these kinds of transactions all the time. I understand the vehemence of your arguments and the direction of the law, but I do have to wonder why it was when he came to ask about the third transaction, the company immediately refunded the $500,000 non-refundable deposit. At that point he declined to sign the document he was asked to sign? But agents in dealings like this don't give up the money lightly, and they could just as easily have stood on the letter of the contract as you're doing here. Agreed. And I don't know exactly why. I will say, and I think the timing is important, that was less than a month or so before Shopko actually went into bankruptcy, and so circumstances had changed. It was later in time from what things were going on at the time that the other contracts were entered into. I want to touch briefly on a couple of things in my last couple of minutes about our alternative grounds for affirmance. There are many other reasons that this case could be affirmed for summary judgment. I want to talk just about a couple of them. No justifiable reliance, that's been talked a little bit about this morning. Not only was all the information in the data room there for Mr. Rafshani to see what was going on with Shopko, but there was a bunch of publicly available information as well. Red flags that he could not ignore. The fact that Spirit had put out, and to be clear, Your Honor, it's Spirit's filings with the SEC and public filings that said we were getting rid of Shopko entities. We were worried about Shopko. That stuff was all publicly available, and Mr. Rafshani cannot simply close his eyes to that. He had an obligation to do that investigation and to look at what he knew, which was that Shopko's revenues were declining, not only in these particular stores but throughout the company, and that there was other information out there. Also there's the omissions, and I want to get to this because I think it's really important. He has this allegation that we knew information that he didn't know, but he's never been able to say what that is, ever. And when he was asked at his deposition, what is the piece of information that you think you should have been told that the sellers had, he refused to answer the question on the basis of attorney-client privilege. So we don't know what the omission is. He has not yet identified it. The other thing I'd point out is that throughout the briefing there are statements about things that were allegedly known or not known without citations to the record, and that's because there is no basis in the record for those. We'd encourage the Court to look very carefully when they say that we know something or knew something or failed to tell them something, is there a record site? Because there is no record site for many of those things. They repeatedly say in there we knew bankruptcy was imminent. There is no evidence in the record, not one place, that we knew that there was going to be bankruptcy. Thank you, Your Honors. Mr. Ansbrough. It leaves the Court, John Ansbrough. What are you planning to add? I thought he had covered all the issues. Well, Your Honor, I was just going to put periods at the end of each of those sentences, but what I was going to add, Your Honor, holding aside, Judge Starr got this correct on the five factors, and I'm not going to repeat all that, but what my problem here, and I'll be very brief, Your Honor, in the aggregate, if you did not even have this contract, fraud in the inducement requires reasonable reliance and there just cannot be any here. There is a totality of the circumstances test. This plaintiff is a 40-year expert. He operates out of Beverly Hills, California. He has a $100 million portfolio that consists of one type of asset, distressed assets. The plaintiff here self-identified himself as an expert in this subject matter. The notion that on this record, somebody in Dallas said to him once or twice, which he can't remember when, who, was it the broker, was it Spirit, said to him a couple of times, hey, Shopko's solid. Their pharmaceutical and their optical is doing well. The notion that any reasonable juror could rely on that is just contrary to any fact finder's mission here. He absolutely could not satisfy that. Why did there have to be two lawyers for your side? Well, it happens to be that the two LLC entities, the Shell Corps, were later acquired by a different company, and that's how I end up in this situation. Your Honor, if you have no further questions, Your Honor, I'll stand down. But there's one thing I just need to say. At paragraph 11 in the complaint, as counsel pointed out, here's the pleading to this Court. Plaintiff, a citizen of Los Angeles County, was unfamiliar with Shopko as either a company or a tenant and took defendants through Travis Carter at their word that it was a large, successful change store. That was false. The gentleman had already owned a property tenant. Shopko had been his tenant for three years. The idea that there could possibly be reasonable reliance here is just beyond the pale. Okay. Thank you. Mr. Bivoli. I am glad he brought it back to that last point because I wanted to point out to the Court, this is an unverified complaint that was prepared by counsel. There's no evidence that Mr. Afshani ever verified it. Obviously, to counsel's knowledge, there had been no experience with Shopko. These guys obviously had scores of experience with Shopko. They've got hundreds of Shopko properties. My client had one single property in Utah that had a Shopko as its tenant. And Mr. Afshani testified in his deposition they never defaulted on their lease once. No reason to suspect that there was any problems with Shopko. All this discussion about what was in the data vault, it's undisputed what wasn't in the data vault. What wasn't in the data vault was the asset backline information that Shopko was getting. I thought I heard counsel say we were Shopko's lender. Not at all true. We were Shopko's landlord. They were Shopko's lender. They are the ones getting asset backline information. They are the ones with complete visibility into Shopko and its failing nature. And instead of disclosing or telling my client any of that, they decided to give him half-truths, mislead, talk about the phenomenal performance of certain divisions, that they're getting rid of nonproductive stores to become a more productive enterprise. My client took all of that, again, with one Shopko that he has that's never defaulted on a lease at face value. He can't be summarily adjudicated on the basis of that. And from our perspective, we're not asking for summary judgment in our favor. They've got arguments. Let them raise them. Let them tell a jury all these arguments they want to make. We're not asking that they be denied that opportunity. The court inquired about the properties. It seems like a good deal. My client testified that the two properties, which I think were purchased for $11,000, there was a total loss of over $6 million. So that certainly supports the inference that without Shopko, these are valueless properties out in the Midwest. As they point out, my client was a California-based real estate investor. For whatever reason, decided to go do business in the Midwest. Let them tell a jury all of that. This business about we didn't address this with Judge Starr. I don't think the court can deny these were kitchen sink motions by both of them. They raised each and every argument under the sun that they could try to assert on the summary judgment motions. We reached each of them as to the facts that were asserted. Notably, in their separate motion to strike the jury demand, where they actually made a lot of the purportedly voluntary nature of the waiver of jury, we did put forth Mr. Afshani's declaration talking about the fact that it was expressly non-negotiable. This business that they're saying, oh, that was the auction's choice to do that, not ours, there's no evidence of that. There's no evidence that they, in fact, and I think the court could certainly infer that they, because the contract says that they selected the auction site to do these auctions, they had control over the terms and form of the agreement, not my client. I just want to address that. There was no waiver of this issue. The district court effectively reached a conclusion without any cited evidence in support. If there's any issues that I've declined to cover, by all means. Thank you.